**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Raymond P. Moore**

Civil Action No. 1:17-cv-01173-RM-KLM

William Deere,

     *Plaintiff*,

     *v.*

XPO Logistics Freight, Inc., and
XPO Logistics, Inc.,

     *Defendants*.

---

# ORDER

---

     This is a case of alleged age and sex employment discrimination and retaliation under the Age Discrimination in Employment Act ("ADEA") and Title VII of the Civil Rights Act of 1964 ("Title VII") surrounding a reduction-in-force ("RIF") and subsequent failure to rehire. Before the Court is Defendants' (collectively, and referred to singularly as "XPO") Motion for Summary Judgment on all claims. (SJ Motion, ECF No. 46.) Plaintiff William Deere opposed the Motion (SJ Opposition, ECF No. 53[1]); Defendants replied. (SJ Reply, ECF No. 64.) Also before the Court is Deere's Motion to Strike and for Sanctions related to evidentiary affidavits of, or references to, certain persons and entities supplied by XPO in the SJ Motion (Strike Motion, ECF No. 65) to which Defendants responded (Strike Response, ECF No. 67.) Because resolution

---

[1]    The Court struck Deere's first opposition in its entirety because his statement of additional facts was "riddled with argument and include[d] nonresponsive responses to [Defendant's] factual statements." (ECF No. 52.) Deere then filed the SJ Opposition, parts of which the Court has already stricken because of Deere's attempts to make material fact changes and raise new arguments. (ECF No. 63.)

of the SJ Motion may depend on the outcome of the Strike Motion, the Court considers them together.

## I.     MOTION TO STRIKE

### A.  Background

On May 21, 2018, XPO filed the SJ Motion. In addition to the statement of undisputed material facts supplied by the parties (Statement, ECF No. 64-1),[2] XPO filed a series of supporting documents by Hiring Manager Steve Bernier (Bernier Dep., ECF No. 46-2), Chief Customer Officer Greg Ritter (Ritter Affidavit, ECF No. 46-3), Human Resources Manager Cindy Anderson (Anderson Affidavit, ECF No. 46-5), Director of Talent Management and Recruiting Terry Riordan (Riordan Affidavit, ECF No. 46-6), and Deere.[3]

The Ritter Affidavit attests that Ritter is responsible for XPO's business development in North America; XPO expected redundancies incident to a merger and "engaged an outside consultant to evaluate the profitability of individual Account Executives for a planned reduction-in-force ['RIF']"; XPO did not provide the consultant with demographic information; and three Denver Region account executives, including Deere, were selected for the RIF based on their region-lowest year-over-year profit growth metric. (*See generally* Ritter Affidavit.) The Anderson Affidavit generally sets out that eleven of the fifteen Denver Region account executives were over 40-years-old;  the other two RIF'ed persons in the Denver Region—Debbie James and William Diaz—were both younger than Deere; and subsequent hires Melody McGinnis and David Gerdes, when hired, were both older than Deere. (*See generally* Anderson

---

[2]     For ease of reference, all future citations to the Statement of Undisputed Facts will be to the latest SJ Reply version (ECF No. 64-1) and referred to as "Statement," regardless of whether the parties' original citation was to the SJ Motion Statement (ECF No. 46-1) or SJ Opposition Statement (ECF No. 53-1).

[3]     The Court is sensitive to the circumstance that the content of these affidavits, unless undisputed, is not to be taken as true for the purposes of summary judgment—even if they are properly considered as to SJ Motion or the Strike Motion. *See* Section II.B, *infra*.

Affidavit.) Finally, the Riordan Affidavit states that XPO posted an open Denver Region account executive position on November 25, 2015; XPO application screeners typically stop moving applicants forward once there are fifteen applications pending the hiring manager's review (but that sixteen applications, each submitted between November 30 and December 15, 2015, moved forward for the position in question); Deere did not apply until December 17, 2015; and Deere did not submit an application for another position—separate from the one posted on November 25, 2015—which was ultimately offered to David Gerdes. (*See generally* Riordan Affidavit.)

After requesting two extensions of time, Deere filed an initial opposition brief on July 6, 2018 (ECF No. 51), which the Court struck because its Statement was nonresponsive and "riddled with argument." (ECF No. 52.) He then filed the SJ Opposition. In large part, rather than dispute the content of the three affidavits, the SJ Opposition suggests that the facts contained therein are in "dispute" merely because Anderson and Riordan "were never disclosed in the litigation." (SJ Opposition at 3 (citing Statement ¶¶ 10, 12, 16–18, 29–30).) Now, in the Strike Motion, Deere asks the Court to eliminate those affidavits in their entirety pursuant to Fed. R. Civ. P. 37(c)(1): "If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion." On this authority, in all but two instances, Deere bases his "disputes" of facts supplied in the affidavits solely on the *identity of the affiant*—Anderson or Riordan—rather than take exception to the *evidentiary content* contained therein. (Statement ¶¶ 10, 12, 16, 18, 30.)[4]

In the SJ Reply, XPO does not dispute that Anderson nor Riordan were previously undisclosed. Instead, it counters that Rule 37(c)(1)'s sanction is not triggered if the "failure was substantially justified or harmless." XPO says including the Anderson and Riordan Affidavits

---

[4] *See, e.g.*, Statement ¶ 12 (**XPO:** "At the time of the RIF, 11 of the 15 Account Executives in the Denver Region were over 40." **Deere:** "Disputed. This averment is by a person/witness not previously disclosed (Cindy Anderson).").

was harmless because Donna Lenahan—who *was* properly disclosed[5] but unavailable at the time the SJ Motion was filed—"is now available and has signed a declaration [ ] which certifies the *identical* facts originally contained in" the other two. (SJ Reply at 1–2 (emphasis in original).) That representation is accurate. (*Compare* Anderson Affidavit, Riordan Affidavit *with* Lenahan Declaration, ECF No. 64-2.)

Finally, the SJ Reply included a Second Ritter Declaration. (ECF No. 64-5.) Not inconsistent with the first, the Second Ritter Declaration provides additional clarification concerning the role of the outside consultant—including its name (McKinsey & Company); that the outside consultant "recommended" using the year-over-year profit growth metric for the RIF; and, based on that recommendation, Ritter made the "ultimate decision" to terminate Deere. (*Compare generally* Ritter Affidavit *with* Second Ritter Declaration.)

### B. Analysis

Deere now asks the Court to strike the Anderson Affidavit in its entirety, Riordan Affidavit in its entirety, Paragraphs 7–9 of the Lenahan Declaration, Paragraphs 2–8 of the Ritter Affidavit, and Paragraphs 3–10 of the Second Ritter Declaration. (Strike Motion at 14.) With these portions of the record gone, Deere believes the Statement should be relieved of Paragraphs 4–8, 11, 16–18, and 29. (*Id.*)

#### i. The Court does not strike the Anderson Affidavit.

The sole proffered reason for striking the Anderson Affidavit is that Anderson was "previously undisclosed." (*See id.* at 1 (citing Rules 26 and 37).) But as XPO points out in the SJ Reply, excluding evidence under Rule 37 is a "drastic sanction" which should not be levied if the late-disclosing party's "failure was substantially justified or harmless." *Summers v. Missouri*

---

[5]    Deere does not dispute that she appeared in XPO's initial disclosures and is also listed in the Final Pretrial Order as one of XPO's fact witnesses. (ECF No. 58, at 8.)

*Pac. R.R. Sys.*, 132 F.3d 599, 604 (10th Cir. 1997); Fed. R. Civ. P. 37(c)(1). "A district court need not make explicit findings concerning the existence of a substantial justification or the harmlessness of a failure to disclose." *Woodworker's Supply, Inc. v. Principal Mut. Life Ins. Co.*, 170 F.3d 985, 993 (10th Cir. 1999) (citing *United States v. $9,041,598.68*, 163 F.3d 238, 252 (5th Cir. 1998)). "Nevertheless, the following factors should guide its discretion: (1) the prejudice or surprise to the party against whom the testimony is offered; (2) the ability of the party to cure the prejudice; (3) the extent to which introducing such testimony would disrupt the trial; and (4) the moving party's bad faith or willfulness." (*Id.*)

Here, the circumstances—applied to these four factors—weigh heavily against striking the Anderson Affidavit. Most importantly, Deere does not move to strike Paragraphs 2–6 of the Lanaham Declaration, which contains the identical factual content earlier provided by Anderson. Deere cannot be prejudiced or disrupted by what he does not dispute, and he is apparently satisfied that XPO has cured his objection by providing the same information from another corporate source. Finally, upon review of the communications Deere supplied with the SJ Opposition, the Court finds that XPO has not acted in bad faith.[6]

### ii. The Court does not strike the Riordan Affidavit or Lenahan Declaration Paragraphs 7–9.

The Court's Rule 37(c)(1) analysis regarding the Riordan Affidavit is the same as with Anderson, and it will not be stricken on that basis. However, Deere additionally moves to strike the Riordan Affidavit (and Lenahan Declaration Paragraphs 7–9, which supply the same information)[7] by arguing that neither Riordan nor Lenahan have knowledge concerning the facts

---

[6]    In fact, XPO offered to have Lenahan provide the statements previously filed through Anderson and Riordan *before* Deere responded to the SJ Motion. (*See* ECF No. 64-7, at 2.) It appears that rather than accept this olive branch, Deere was content to confront the facts alleged therein based on nothing more than their sources.

[7]    The Court will not strike Riordan Affidavit Paragraph 2 because it is identical to Lenahan Declaration Paragraph 6, which Deere does not move to strike.

to which they attest. (Strike Motion at 10.) Deere provides no basis for this accusation, and the Court cannot supply one.

The content at issue sets forth that XPO application screeners typically stop moving applicants forward once there are fifteen applications pending the hiring manager's review (but that sixteen applications, each submitted between November 30 and December 15, 2015, moved forward for the position in question); Deere did not apply until December 17, 2015; and Deere did not submit an application for the position which was ultimately offered to David Gerdes. (*See* Riordan Affidavit ¶¶ 3–5; Lenahan Declaration ¶¶ 7–9.) Without any legitimate basis to believe otherwise provided by Deere, the Court does not question that Regional Director of Human Resources Donna Lenahan and Director of Talent Management and Recruiting Terry Riordan are both qualified based on personal knowledge to attest to XPO's application processes, including those facts specifically laid out in their affidavits.[8] *See, e.g.*, *Argo v. Blue Cross & Blue Shield of Kansas, Inc*., 452 F.3d 1193, 1200 (10th Cir. 2006) (suggesting that a human resources official would be in a position to acquire comprehensive knowledge concerning a company's employees).

Lastly, Deere argues that "it is patent [Lenahan's statements] are all hearsay." (Strike Motion at 10 (internal emphasis omitted).) The Court disagrees. Parties may submit affidavits in support of summary judgment, despite the fact that affidavits are often inadmissible at trial as hearsay, on the theory that the evidence may ultimately be presented at trial in an admissible form. *Argo*, 452 F.3d at 1199. Nonetheless, "the content or substance of the evidence must be admissible." *Thomas v. Int'l Bus. Machs.*, 48 F.3d 478, 485 (10th Cir.1995). For example, at

---

[8] Lenahan declared that she has "access to employees' personnel files, which include information showing employees' and former employees' dates of birth [and] access to documents relating to the hiring process at the company." (Lenahan Declaration ¶ 1.) Riordan attested that, through his 8 years as Director, he has knowledge of XPO Logistics' recruiting processes and of the applications [XPO] receive[s] for job postings. (Riordan Affidavit ¶ 1.)

summary judgment, courts should only disregard inadmissible hearsay statements *contained in* affidavits, as those statements could not be presented at trial in any form. *Argo*, 452 F.3d at 1199 (emphasis in original). While the Lenahan Declaration was made out of court, none of the content contained therein would be inadmissible should she later testify. Indeed, Paragraphs 7–9 swear only to *behavior* by both Deere and XPO, not statements. The Court will not exclude the Lenahan Declaration from its SJ Motion consideration.

### iii. The Court does not strike either the Ritter Affidavit or Second Ritter Declaration.

Finally, upon review of the Second Ritter Declaration, Deere is incensed by what he calls XPO's "hiding," "sandbagging," "stonewalling," "flip-flopping," "concealment," and "lying in the weeds." (Strike Motion at 2–4.) The Court is not convinced this hyperbolic name-calling is deserved, especially where, as here, it appears that Deere needs only look inward to find the source of his frustration.

This Ritter dispute appears to center upon divining which person (or entity) is responsible for making the ultimate decision to terminate Deere based on his year-over-year profit growth deficiencies. XPO has stated its position on this issue in *slightly* different ways throughout the course of the litigation:

> **December 29, 2017 (Resp. to Interrog., ECF No. 65-1, at 10)**
> [XPO] state[s] that because Mr. Deere had the most negative growth of any other Account Executive in the Denver region, Greg Ritter, Chief Customer Officer, Global Sales—along with an outside consultant—determined that Plaintiff would be selected for the reduction in force.

> **May 14, 2018 (Ritter Affidavit)**
> In connection with the merger . . . XPO [ ] expected redundancies in the sales function and engaged an outside consultant to evaluate the profitability of individual Account Executives for a planned reduction-in-force ("RIF").

**September 4, 2018 (Final Pretrial Order, ECF No. 58)**
Greg Ritter . . . will testify in person regarding the reduction-in-force, the role of the outside consultant, his adoption of the consultant's recommendations, the use of year-over-year profit growth as the metric for determining which Account Executives to include in the reduction-in-force[.]

**January 23, 2019 (Second Ritter Declaration)**
I worked with an outside consultant, McKinsey & Company (a global management consulting firm) regarding the reduction-in-force. McKinsey recommended using year-over-year profit growth to determine who would be selected for the reduction-in-force. I agreed, and made the decision to use this metric to select which individuals would be selected for the RIF. . . . McKinsey recommended the 36 individuals with the lowest year-over-year profit growth for the reduction in force. I reviewed McKinsey's recommendations and implemented them.

The umbrage with which Deere takes these variations is not clearly presented, but it seems that he believes the Court should strike sections of both Ritter affidavits on the bases of discovery violations, hearsay, and internally inconsistent representations by XPO. Finding none of these, the Court declines to do so.

Beginning with the last protest, Deere accuses XPO of changing its story to now reveal the name, and limit the involvement, of a previously undisclosed "outside consultant." To make that leap, Deere reads the Ritter Affidavit to mean that Ritter fired him *in conjunction with* the "outside consultant," and he interprets the Second Ritter Declaration to mean that Ritter, *acting alone*, adopted and implemented McKinsey's suggestions. (*See* Strike Motion at 8.) Unlike Deere, the Court does not view the Second Ritter Declaration as inconsistent with the first Ritter Affidavit or with any of the other statements quoted above. But more importantly, the level of involvement of the outside consultant is immaterial to the outcome of the SJ Motion because XPO concedes that *it* terminated Deere, and it is XPO's animus (or lack of it)—not McKinsey's—that is being tested in this case.

Moreover, summary judgment movants are permitted, by affidavit, to clarify their earlier positions in response to arguments raised in opposition. *See, e.g.*, *Altamirano v. Chem. Safety & Hazard Investigation Bd.*, 41 F. Supp. 3d 982, 993 (D. Colo. 2014) ("[W]here the reply affidavit merely responds to matters placed in issue by the opposition brief and does not spring upon the opposing party new reasons for the entry of summary judgment, reply papers—both briefs and affidavits—may properly address those issues."); *see also Gates Corp. v. Dorman Products, Inc.*, No. 09–cv–02058–CMA–KLM, 2009 WL 4675099, at *2 (D. Colo. Dec. 7, 2009) (finding that arguments in a reply brief are not considered "new" where they respond directly to arguments raised in the response brief). Since Deere surmises in opposition that RIF decisions were made in part by an outside consultant who has not been identified, XPO is permitted to clarify in reply that Ritter alone had final decision-making authority and give the name of that consultant. (*See* Statement ¶ 5). Because the Ritter materials may be read together harmoniously, the Court will not strike either on this basis.

Second, to the extent that Deere reads the Ritter Affidavit incorrectly, is confused, or believes he has lost the opportunity to glean discovery from McKinsey, his troubles are self-inflicted. Deere cannot dispute that he has been aware of the "outside consultant" since at least 2017, many months before the discovery deadline on April 1, 2018. (*See* ECF Nos. 24, 65-1.) Even though he grumbles that XPO did not reveal McKinsey's name until now, the record does not reflect that Deere ever attempted to compel a more specific interrogatory response from XPO to supply that information.[9] Rather than "concealment," as Deere describes it, the Court views

---

[9] Additionally, Deere was not even aware he did not have the name of the consultant until July 3, 2018, solidifying the Court's supposition that Deere is manufacturing a dispute for purposes of avoiding summary judgment. (ECF No. 65-3.)

Deere's limited understanding of the identity and role of the outside consultant as the product of his own failure to gather discovery with diligence.[10]

Finally, Deere, without citing any cases in support, characterizes the content of both Ritter affidavits as hearsay. (Strike Motion at 7.) But Deere is incorrect using either of his proffered interpretations. If Ritter and McKinsey were working together and both fired Deere, then Ritter could testify in court as to their methods and conclusions based on his personal knowledge. If Ritter was merely the final decision-maker who adopted McKinsey's suggestions, then McKinsey's involvement is non hearsay offered for its effect on Ritter and the influence it had over his decision to terminate Deere. *See, e.g.*, *Faulkner v. Super Valu Stores, Inc.*, 3 F.3d 1419, 1434–35 (10th Cir. 1993) (affirming this Court's finding that statements made by third parties to grocer's hiring manager were offered to establish grocer's state of mind in making hiring decisions, rather than to prove the truth of the statements, and therefore the statements were non-hearsay). Either way, Ritter is a proper affiant and the evidence is admissible.

## C. Conclusion

For the foregoing reasons, the Strike Motion is **DENIED**. The Court will disregard any "disputes" by Deere contained in the Statement based solely on the identity of the affiant and treat those facts as undisputed. To the extent any "disputes"—more properly characterized as evidentiary objections—question the admissibility of the content of the affidavits and declarations discussed herein, the Court overrules those objections and will consider such contents in examining the SJ Motion. Finally, based on the available record, the Court declines to award monetary sanctions to XPO in the amount it incurred in opposing the Strike Motion.

---

[10] The Court also does not comment on Deere's unsupported accusation that the absence of "electronic or documentary communication" between XPO and McKinsey is "legally incredible" in light of Deere's failure to have ever moved to compel the production of any such materials.

## II.    MOTION FOR SUMMARY JUDGMENT

### A.  Undisputed Facts

For purposes of the Motion, the facts which are undisputed—or taken in the light most favorable to Deere—relate to his termination, XPO's failure to rehire him, and the circumstances surrounding a demand letter sent by his attorney to XPO.

### i.  Deere's Termination

Deere, born May 19, 1970 and in his 40s, worked as one of fifteen account executives at Conway Freight, Inc. ("Conway"). (Statement ¶¶ 1–2, 12.) In his role as account executive, Deere was responsible for a certain territory in the Denver Region. (*Id.* ¶ 14.)[11] When XPO acquired Conway, he worked in the same capacity for XPO. (*Id.* ¶ 2.) In connection with that merger, XPO "engaged an outside consultant to evaluate the profitability of individual Account Executives for a planned reduction-in-force." (*Id.* ¶ 4.)[12] XPO did not supply the outside consultant with demographic information concerning the account executives under evaluation, and the consultant suggested that XPO use year-over-year profit as its "key metric" in deciding whom to terminate. (*Id.* ¶ 4.)[13] The termination decision was made by XPO's Chief Customer Officer Greg Ritter working together in some capacity with the outside consultant. (*Id.* ¶ 4.)[14]

---

[11]   The parties agree that all of the account executives in the Denver Region had the same duties and were answerable to the same chain of command within the same personnel structure. (Statement ¶ 45.)

[12]   XPO attributes the reduction-in-force ("RIF") to "expected redundancies." (Statement ¶ 4.) While Deere generally disputes that there were any redundancies at all, he doesn't dispute that the RIF was "planned" or that XPO subjectively expected redundancies. (*Id.*)

[13]   While Deere disputes that year-over-year profit growth was actually a "key metric" (Statement ¶ 5), he does not dispute that the consultant suggested, and XPO used, this metric in making termination decisions.

[14]   Deere makes much of the disputed fact that Hiring Manager Steve Bernier had a high opinion of Deere and may have even disagreed with the decision (Statement ¶¶ 51–52, 55) but admits that Bernier was not involved in his termination and did not even know why Deere was terminated. (*Id.* ¶ 53.) Additionally, Human Resources Director Kevin Huner was not involved in the RIF. (*Id.* ¶ 54.)

On October 30, 2015, after XPO's acquisition of Conway closed, XPO terminated its three Denver Region account executives with the lowest year-over-year profit growth in a reduction-in-force ("RIF"),[15] including Deere (lowest) and non-plaintiffs Debbie James and William Diaz (second and third lowest). (*Id.* ¶¶ 4, 7–9, 11, 27.)[16] XPO sent Deere a letter communicating that his "position has been eliminated." (*Id.* ¶ 34.) According to Deere, XPO also called him and said, "your territory has been eliminated." (*Id.* ¶ 33.) Deere was 45 years old at the time of the RIF. (*Id.* ¶ 41.)

According to Deere, year-over-year profit growth was one of—but not the only— performance metric relevant to his position. (*Id.* ¶ 5.) He notes that, in the Denver Region, his figures were only fifth lowest in "Revenue Growth" and sixth lowest in the "Conway Rankings." (*Id.*) Additionally, Deere rated higher than eight other account executives in the "Performance vs. Con-way targets" category. (*Id.* ¶ 39.) In this metric, Deere earned a "yellow circle" on his "scorecard," while three non-RIF'ed employees had flunking "red circles." (*Id.* ¶ 38.) Deere points to XPO's decision to base terminations on year-over-year profit growth, rather than one of these other metrics, as the "deceptive" means by which XPO eliminated him: "[T]he company's use of a single category of statistics to RIF employees was deceptive and made no business sense." (*Id.* ¶¶ 5, 42, 47.)

At the time of the RIF, eleven of fifteen account executives were over 40 years old, and both James and Diaz were younger than Deere. (*Id.* ¶¶ 10, 12.) At least one employee that survived the RIF, Patrick Ferrell, was younger than Deere but had a "lucrative territory" and performance numbers in "really good shape." (*Id.* ¶¶ 13–14.) Deere supplied sales figures

[15]  Plaintiff has admitted, in several parts of the Statement, that his termination was incident to a RIF. *See*, *e.g.*, Statement ¶¶ 4–9, 12–15. The review period for the RIF was September 2014 to August 2015. (*Id.* ¶ 48.)

[16]  The RIF was not limited to the Denver Region. In all, XPO cut 10% of its account executives (36 people) across the nation. (Statement ¶ 4 (citing Second Ritter Declaration ¶ 2).)

showing that his year-over-year profit growth through August 30, 2015 was **negative** $125,048, while Ferrell had a **positive** $120,821. (*Id.* ¶ 14.) Another RIF-survivor, Andy Reese, was "in his early 30s" and lower ranked than Deere in three categories: "Performance vs. Con-Way Targets," "Revenue Growth," and "Con-Way Ranking." (*Id.* ¶ 41.) But it is undisputed that XPO did not terminate at least nine account executives in the Denver Region over 40 in the RIF. (*Id.* ¶¶ 9–10.) Moreover, the average age of a Denver Region account executive increased from 46.2 to 47.75 following the RIF. (*Id.* ¶ 71.) Finally, it is undisputed that female Melissa Wentz had a lower score than him in the "Absolute Performance" category but kept her job. (*Id.* ¶ 40.)

### ii. XPO's Failure to Hire Deere After his Termination

Shortly after the RIF, another account executive, Joe Engle, left the company. (*Id.* ¶ 15.) Because of that vacancy, XPO posted an account executive opening on November 25, 2015. (*Id.* ¶ 16). By December 15, 2015, recruiting coordinators had forwarded 16 applications to Hiring Manager Steve Bernier for review, and all applications received subsequently were rejected without Bernier's attention. (*Id.* ¶¶ 17, 22.) Deere applied on December 17, 2015, XPO acknowledged receipt, and a website screenshot shows: "Submission Status: Completed – Updated: Dec. 22, 2015." (*Id.* ¶ 18.) Deere does not dispute that Bernier made the relevant hiring decisions. He also does not believe that Bernier discriminated against him. (*Id.* ¶ 32.)[17]

Before Deere applied, Bernier had already twice interviewed female candidate Melody McGinnis, a 51-year-old, and decided to hire her. (*Id.* ¶¶ 19, 23.) On December 9, 2015, Bernier offered McGinnis the job. (*Id.* ¶ 21.) She was initially offered two sales territories—one formerly belonging to Deere. (*Id.* ¶ 33.) While Bernier had previously asked upper management to

---

[17]   This fact is undisputed on the basis of Deere's deposition. (Statement ¶ 32 (citing Deere Dep., ECF No. 46-4, at 92:5–10).) For the first time in the SJ Response, Deere attempts to undo his admission by manufacturing a contrary motive for Bernier. (*See id.* (citing Deere Decl., ECF No. 53-26, at 6).) Deere's speculation in this portion of his declaration are immaterial and not well-taken. The Court disregards them.

consider re-hiring Deere, he never looked at Deere for this vacant position. He testified: "I didn't even think of Will Deere." (*Id.* ¶ 20.) When Deere inquired as to whether there was any progress with his application, XPO account executives (not Bernier) informed him that applications were still being considered and no decision had been made. (*Id.* ¶ 64.) After McGinnis accepted the position on December 21, 2015, XPO's job submission website reflects that the job status was "Inactive (No Longer Accepting Job Submissions)." (*Id.* ¶ 65.)

In 2016, XPO "determin[ed] that business had suffered from the RIF and that they needed to add another Account Executive to the Region" and decided to hire 46-year-old David Gerdes for the position. (*Id.* ¶¶ 27, 30.) Deere did not specifically apply for this position. (*Id.* ¶ 29.)[18] As with McGinnis, Bernier was the ultimate decision-maker in hiring Gerdes. (*Id.* ¶ 31.) At some unspecified time, Gerdes became responsible for the "generally" identical territory that used to be Deere's. (*Id.* ¶ 33.) In his deposition, Deere clarified that he does not believe XPO engaged in any age discrimination in failing to rehire him. (*Id.* ¶ 29 (citing Deere Dep., ECF No. 46-4, at 80:16–22).)

### iii. Deere's Attorney's E-mail to XPO

Meanwhile, on December 7, 2015, Deere's attorney e-mailed XPO's Vice President and General Counsel Jennifer Warner stating Deere believed his termination was the result of age discrimination. (*Id.* ¶¶ 25, 59.) The parties agree that Deere's attorneys further attempted to include Director of Human Resources Kevin Huner and Bernier on the e-mail, but dispute whether those persons actually received the communication. (*Id.* ¶ 59.) The attorney's entire e-mail stated:

---

[18] Bernier testified, and Deere does not dispute, that XPO maintains an applicant file only with respect to the specific job for which the application was submitted. He further testified that "[T]here was a job posting for that position [which ultimately went to Gerdes]. And I did not see [Deere's] application or resume for that position. So I did not – I wasn't aware that he was interested in that position, if he was." (Statement ¶ 29 (quoting Deere Dep. 22:23–23:2).)

Our law firm has been retained by William Deere with relationship to his recent termination coupled with significant indication that age discrimination was involved in his firing and the firing of many other former Con-way Freight employees.

We will be investigating further in the coming week and would like to conduct an interview with the person or persons who selected our client for termination instead of the significantly younger newcomer in the same unit. This appears to be a rather straightforward breach of the federal Age Discrimination in Employment Act, and it has classwide implications.

Please let me know the name or names of the persons responsible and let me know when I and my investigator can travel to their location within the next week to conduct interviews. They and the company of course, may wish to have their own attorneys present.

(*Id.*) Two days later on December 9, 2015, Bernier offered a job to McGinnis—whom he had met for lunch at Bass Pro Shops some six weeks earlier at the recommendation of another XPO employee. (*Id.* ¶¶ 21, 61, 63.)[19] Deere admits that McGinnis had been recommended to Bernier "quite some time ago" and that she had a reputation for doing "a good job." (*Id.* ¶ 62.)

### B. Legal Standard

Summary judgment is appropriate if there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Adamson v. Multi Community Diversified Servs., Inc.*, 514 F.3d 1136, 1145 (10th Cir. 2008). A fact is material if it could affect the outcome of the suit under governing law; a dispute of fact is genuine if a rational jury could find for the nonmoving party on the evidence presented. *Id.*

On a motion for summary judgment, the moving party bears the burden of demonstrating no genuine issue of material fact exists. *Adamson*, 514 F.3d at 1145. Where, as here, the moving party does not bear the ultimate burden of persuasion at trial, it may satisfy this burden by

---

[19]   The parties don't dispute that Bernier met with McGinnis "about three weeks after plaintiff was fired [ ] on October 30, 2015" (Statement ¶ 61) and that Bernier offered her the position on December 9, 2015. (*Id.* ¶ 21.)

demonstrating a lack of evidence for an essential element of the non-movant's claim. *Id.* That is, "once [d]efendants [have] showed that they were entitled to summary judgment, it bec[omes] [a plaintiff's] burden as the non-movant to set forth specific facts demonstrating that there was a genuine issue for trial as to those material matters for which [he] carries the burden of proof." *Reynolds v. Sch. Dist. No. 1, Denver, Colo.*, 69 F.3d 1523, 1531 (10th Cir. 1995).

In deciding whether the moving party has carried its burden, courts do not weigh the evidence and instead must view it and draw all reasonable inferences from it in the light most favorable to the non-moving party. *Adamson*, 514 F.3d at 1145. However, neither unsupported conclusory allegations nor mere scintilla of evidence are sufficient to create a genuine dispute of material fact on summary judgment. *Maxey v. Rest. Concepts II, LLC*, 654 F. Supp. 2d 1284, 1291 (D. Colo. 2009). "If a party fails to properly support an assertion of fact of fails to properly address another party's assertion of fact, a court may . . . consider the fact undisputed for the purposes of the motion." Fed. R. Civ. P. 56(e)(2).

## C.  Analysis

The Court begins by addressing the apparent confusion concerning what claims Deere actually brings. The shotgun Complaint strictly sets out **two** causes of action, neither saying anything more than "[b]y the aforesaid acts of discrimination and retaliation, the defendant corporations breached [Title VII / ADEA]." (Compl., ECF No. 1.)[20] The Complaint fails to match *any* conduct to *any* claim. XPO interprets this case as "bring[ing] *five* claims against Defendants: (1) an ADEA termination claim; (2) an ADEA failure-to-rehire claim; (3) a Title VII

---

[20]  "This Court has strongly criticized such use of 'shotgun pleading,' by which a party pleads several counts or causes of action, each of which incorporates by reference the entirety of its predecessors." *Int'l Acad. of Bus. & Fin. Mgmt., Ltd. v. Mentz*, No. 12-CV-00463-CMA-BNB, 2013 WL 212640, at *7 (D. Colo. Jan. 18, 2013). *See also Greenway Nutrients, Inc. v. Blackburn*, 33 F. Supp. 3d 1224, 1243 (D. Colo. 2014) ("[T]he shotgun pleader foists off one of the pleading lawyer's critical tasks—sifting a mountain of facts down to a handful of those that are relevant to a given claim—onto the reader.") (citation omitted).

failure-to-rehire claim; (4) an ADEA retaliation claim; and (5) a Title VII retaliation claim." (SJ Motion at 1 (emphasis supplied).)[21] Based on its review of the threadbare, scattershot Complaint—but reading it in the light most favorable to Deere—the Court interprets the pleadings as stating claims for ADEA unlawful termination and Title VII failure-to-hire or retaliation for the reasons that follow.

The only act of retaliation conceivably alleged is XPO's "failure to [ ] rehire [Deere] into the same or similar jobs." (Compl. ¶ 50; *see also* Final Pretrial Order, ECF No. 58, at 3–4 ("Plaintiff's job applications were not considered because the defendant corporations did not wish to hire someone who had complained about [XPO's] discrimination. Thus, [XPO] elected to retaliate against plaintiff.").) In his deposition, Deere clarified that he does not believe his age played any role in XPO's failure to rehire him, nor has he supplied any evidence that such was the case.[22] Therefore, because his retaliation and failure-to-rehire claims are both dependent upon the same alleged conduct, and because he can show no behavior giving rise to the inference of age discrimination with respect to either, the Court finds as a matter of law that judgment in favor of XPO is appropriate to the extent that Deere asserts retaliation or failure-to-rehire claims

---

[21] The Complaint does not contain any allegations to support a claim of unlawful termination in violation of Title VII. (*See generally* Compl.) Neither does the Final Pretrial Order. (ECF No. 58, at 1–4 (containing nothing on the topic).) In the SJ Opposition, for the first time in this case, Deere suggests that he claims unlawful termination under Title VII by pointing to an "identically situated female Account Executive who was not terminated in the RIF." (SJ Opposition at 3.) Deere cites Statement Paragraph 4, which contains no textual or documentary reference to this other female employee, and the Court declines to search for evidence to support a claim that Deere has not made. As XPO correctly points out "no gender-based termination claim is at issue in this case." (SJ Reply at 3.) Moreover, the Court notes that XPO also fired a female in the RIF. In these circumstances, the Court finds that Deere cannot show that XPO's termination conduct gives rise to the inference of gender discrimination or was pretextual when both males and females were fired for their poor year-over-year profit growth numbers. *See, e.g.*, *Allen v. Sulzer Chemtech USA, Inc.*, 289 F. App'x 278, 282–83 (10th Cir. 2008) (finding that, when compared to treatment of male employees, female being fired for the same reasons as males did not show any evidence of discrimination or "suggest that [the defendant's consistently stated explanation for terminating her was false.").

[22] This admission forecloses any argument that XPO's failure to rehire Deere was under circumstances giving rise to age discrimination.

under the ADEA.[23] Thus, the Court turns to the merits and only considers whether Deere survives the SJ motion on claims of (i) ADEA unlawful termination, or (ii) Title VII failure-to-rehire or retaliation.[24]

Relevant here, the ADEA bars an employer from discharging any individual because of such a person's age. 29 U.S.C. § 623 (a)(1). Similarly, Title VII prohibits an employer from failing or refusing to hire any individual because of that person's sex. 42 U.S.C.A. § 2000e-2(a)(1). When a plaintiff musters only circumstantial evidence of discrimination, courts analyze whether his claims under either statute survive a motion for summary judgment against the backdrop of the familiar *McDonnell Douglas* three-step burden-shifting framework. *Fischer v. Forestwood Co.*, 525 F.3d 972, 978 (10th Cir. 2008) (Title VII); *McKnight v. Kimberly Clark Corp.*, 149 F.3d 1125, 1128 (10th Cir. 1998) (ADEA). *See also O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 311 (1996) (noting the standards application to both statutes).

At step one, to prove a prima facie case of discrimination, a plaintiff must show: (1) he is a member of the protected class; (2) he suffered an adverse employment action; (3) he was qualified for the position at issue; and (4) he was treated less favorably than others not in the protected class. *Jones v. Oklahoma City Pub. Sch.*, 617 F.3d 1273, 1279 (10th Cir. 2010). Sometimes the fourth element is restated to require "some [circumstantial] evidence the employer intended to discriminate against him." *Pippin v. Burlington Res. Oil & Gas Co.*, 440

---

[23]    To the extent the Complaint alleges failure-to-hire retaliation under the ADEA in response to the attorney e-mail, the undisputed facts show no causal connection between the e-mail and failure-to-hire or that XPO's conduct was pretextual: McGinnis had already been offered Deere's old job by the time he applied, and Deere never even applied for the position which was given to Gerdes. Moreover, Deere does not dispute that XPO created the opening that ultimately went to Gerdes based on its non-pretextual "determin[ation] that business had suffered from the RIF and that they needed to add another Account Executive to the Region." *See Brainard v. City of Topeka*, 597 F. App'x 974, 981 (10th Cir. 2015) (setting out the elements of Retaliation under the ADEA and employing *McDonnell Douglas* burden-shifting framework); *see also* Section II.C.ii, *infra*.

[24]    These claims are also best viewed together because the only alleged act of retaliation is XPO's failure to re-hire Deere.

F.3d 1186, 1192 (10th Cir. 2006). The prima facie case under the ADEA or in Title VII retaliation cases also demands that Plaintiff offer facts to show that his protected-class status (*e.g.*, age or sex) was not merely a motivating factor behind the alleged adverse actions, but was indeed the "but for" cause of the employer's actions. *Hart v. Dillon Companies, Inc.*, 2014 WL 6819724, at *7 (D. Colo. Dec. 3, 2014). In other words, Plaintiff must establish that his employer "would not have taken the challenged employment action but for the [complainant's age or sex]." *See, e.g.*, *Konzak v. Wells Fargo Bank N.A.*, 492 F. App'x 906, 909 (10th Cir. 2012) (citing *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177-78 (2009)). *See also Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 339 (2013).

If a plaintiff makes out a prima facie case, step two shifts the burden to the defendant "to rebut this presumption of discriminatory intent by asserting a legitimate, nondiscriminatory reason for the employment decision." *Pippin*, 440 F.3d at 1193. If the Defendant meets this burden of production, at step three, "the burden shifts back again to the plaintiff to show that the defendant's proffered reasons were a pretext for discrimination." *Rea v. Martin Marietta Corp.*, 29 F.3d 1450, 1455 (10th Cir. 1994). In other words, Plaintiff must then resist summary judgment by presenting evidence that the proffered reason was "unworthy of belief." *Beaird v. Seagate Tech., Inc.*, 145 F.3d 1159, 1165 (10th Cir. 1998) (quoting *Randle v. City of Aurora*, 69 F.3d 441, 451 (10th Cir. 1995)).

### i. Deere has failed to make a prima facie showing that XPO discriminated against Deere in violation of the ADEA by terminating him.

For the purposes of the SJ Motion, XPO concedes that Deere meets the first three factors of his prima facie case. Deere (1) is protected by the ADEA because he was over 40 at the time of the events alleged, (2) certainly suffered adverse employment action by his termination, and (3) no one quibbles that he was not qualified for his position.

As to step one's fourth factor—regarding circumstances giving rise to the inference of age discrimination on an ADEA termination claim—the Tenth Circuit had unwaveringly explained that a plaintiff must show that "his position was filled by a younger person." *See, e.g.*, *McKnight*, 149 F.3d at 1128; *Rangel v. sanofi aventis U.S., LLC*, 507 F. App'x 786, 790 (10th Cir. 2013); *Cone v. Longmont United Hosp. Ass'n*, 14 F.3d 526, 529 (10th Cir. 1994); *Denison v. Swaco Geolograph Co.*, 941 F.2d 1416, 1420 (10th Cir. 1991). The logic behind this rule is sound: It is inconceivable that a business would terminate an employee because of his age only to fill that void with even older individuals.

Here, taking the facts in the light most favorable to him, Deere was 45 years old when terminated, and he was replaced by 51-year-old McGinnis and 46-year-old Gerdes. He provides no evidence whatsoever that he was replaced by anyone younger. His ADEA termination claim fails on this fact alone. *Se*e, *e.g.*, *Rangel*, 507 F. App'x at 791 (strictly adhering to the younger-replacement rule in a RIF case and affirming the district court's grant of summary judgment for the defendant).

The Court's finding that Deere has failed his prima facie showing is only strengthened by its review of other tests. In RIF-specific cases, the Tenth Circuit has explained the discrimination-inference factor as requiring plaintiff to show "some evidence the employer intended to discriminate against [him] in reaching its RIF decision," which may be established "through circumstantial evidence that the plaintiff was treated less favorably than younger employees during the [RIF]." *Beaird*, 145 F.3d at 1165 (citing *Ingels v. Thiokol Corp.*, 42 F.3d 616, 621 (10th Cir. 1994). Viewed from this perspective, XPO has set out facts devastating to Deere's claim that Deere fails to dispute or rebut with credible evidence. He does not dispute that, at the time of the RIF, eleven of fifteen account managers in the Denver Region were over

40 years old. Neither does he refute that XPO showed no hesitation in terminating younger employees. At least nine account managers over 40 kept their jobs, and the RIF caused the average age of account executives in the Denver region to *increase*.

Even if Deere had made out a prima facie case, he has done nothing to undermine XPO's legitimate business explanation. While Deere may disagree with the wisdom behind it, he does not dispute that XPO selected a non-discriminatory performance metric—year-over-year profit growth—to cut its least impressive employees and did not limit those cuts to older employees. Even though he questions whether the metric used was indeed the "key metric," he does not dispute that XPO legitimately believed it was using the appropriate measure. *See*, *e.g.*, *Pippin*, 440 F.3d at 1196–97 (An employer "may choose to conduct its RIF according to its preferred criteria of performance . . . and [the court] will not disturb that exercise of defendant's business judgment.").

Taking the facts in the light most favorable to Deere, he was replaced by older people and appears to have been "RIF'ed" based on poor performance. Therefore, because he fails at every step of the burden-shifting framework, Deere's ADEA claim(s) are **DISMISSED** with prejudice.

### ii. Deere cannot make out a prima facie case against XPO for gender-based retaliation or failure-to-hire in violation of Title VII.

As noted above, Deere has alleged no conceivable act of gender-based retaliation other than XPO's failure to re-hire him. Thus, to the extent the Complaint can be read to have asserted separate claims for failure-to-rehire and retaliation, the Court considers them together. Because the claim(s) are brought under Title VII, the Court considers only the circumstances surrounding XPO's choice to hire McGinnis.

To show circumstances giving rise to an inference of discrimination in the failure-to-hire context, a plaintiff must show that he (1) applied for and (2) was qualified for a job for which the

employer was seeking applicants and (3) the employer continued to seek applicants after rejecting the plaintiff's application. *Cruces v. Utah State Veterans Nursing Home*, 222 F. App'x 776, 779–80 (10th Cir. 2007).

Taking the facts in the light most favorable to Deere, there is no dispute that he was qualified for his old job. Moreover, XPO hired McGinnis a few days after Deere's attorney sent the e-mail alleging age discrimination, which the court construes as having been received for the purposes of the SJ Motion only. However, it is undisputed that XPO offered the position to McGinnis before Deere submitted any application, and, at any rate, Bernier never saw his belated submission. Put another way, at the time XPO offered McGinnis a job, hiring Deere was not an option, and even after the position was filled, the decision-maker never had an opportunity to reject him. Without Deere in the applicant pool, it is not possible that XPO sought to employ McGinnis to spite Deere's candidacy. With no other evidence to support an inference of sex discrimination, Deere has failed to make out a prima facie case.

But even assuming, *arguendo*, that Deere overcame his prima facie hurdle, his own admissions have irretrievably undermined his ability to show pretext. Deere agrees that Bernier hired McGinnis, she had been recommended "quite some time ago," and she had a reputation for doing "a good job." He has also expressly affirmed that he does not believe Bernier discriminated against him. Thus, he is now unable to discredit that XPO made its hiring decisions on McGinnis's merit, and that a discriminatory motive did not figure into XPO's hiring calculus. *See Bullington v. United Air Lines, Inc.*, 186 F.3d 1301, 1319 (10th Cir. 1999), *abrogated on other grounds by Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 122 (2002) ("[W]e emphasize that an employer does not violate Title VII by choosing between *equally*

qualified candidates, so long as the decision is not based on unlawful criteria. . . . The disparity in qualifications must be 'overwhelming' to be evidence of pretext.").

Therefore, because his failure-to-rehire and retaliation claims also fail at every step of the burden-shifting framework, Deere's Title VII claim(s) are **DISMISSED** with prejudice.

## III.     CONCLUSION

For the foregoing reasons, the Strike Motion is **DENIED**, and (2) XPO's SJ Motion is **GRANTED**. Deere's Complaint is **DISMISSED** with prejudice. The Clerk shall enter judgment as set forth herein in favor of XPO Logistics Freight, Inc. and XPO Logistics, Inc. and close this case.


DATED this 20th day of February, 2019.

BY THE COURT:

RAYMOND P. MOORE
United States District Judge